**CRAIG et al. v. HEIDE & CO., Inc.**
**CRAIG et al. v. WILMINGTON**
**SHIPPING CO.**
Civ. Nos. 368, 369.

United States District Court,
E. D. North Carolina.
Wilmington Division.
Jan. 2, 1951.

W. P. Burkhimer, Thomas W. Davis, Wilmington, N. C., for plaintiffs.

Bellamy & Bellamy, and David H. Scott, all of Wilmington, N. C., for defendants.

GILLIAM, District Judge.

█ It is not denied by the defendants that during the period involved they were in some instances engaged in commerce and production of goods for commerce within the meaning of the provisions of the Fair Labor Standards Act, as amended. Nor is it denied that, therefore, some of their employees were entitled to the benefits of the Act. But the defendants contend rightfully that the question presented is whether the plaintiffs, while serving as watchmen on the ships, were "engaged in commerce" or "in the production of goods for commerce" within the meaning of Sec. 7(a) of the Act. As the Supreme Court said in Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 90, 63 S.Ct. 125, 126, 87 L.Ed. 83: "The application of the Act depends upon the character of the employees' activities". The law to this effect seems to be definitely settled.

It seems that the facts present two questions, that is, (1) were the plaintiffs engaged in commerce or in the production of goods for commerce, as they alleged, and (2) was there an employer-employee relationship between the plaintiffs on the one hand and the defendants on the other; or, in other words, were the plaintiffs employees of the defendants or of the United States Maritime Commission.

If the plaintiffs in the performance of their services were engaged in commerce or in the production of goods for commerce, they are entitled to recover overtime pay if they were employees of the defendants rather than of the United States Maritime Commission.

█ The court is of the opinion and holds that repair, improvement or maintenance work on a vessel, an instrumentality of commerce, should be considered as within the "in commerce" coverage of the Act, even though it was contemplated to withdraw the vessel for a time from service. Slover v. Wathen, 4 Cir., 140 F.2d 258; Walling v. Keansburg Steamship Co., 3 Cir., 162 F.2d 405; Divins v. Hazeltine Electronics Corp., 2 Cir., 163 F.2d 100. Perhaps, if these vessels had been permanently withdrawn from services and the work thereon, including that of plaintiffs, had been performed with no intention or contemplation, or reason to contemplate, that they would be used again in commerce, the work performed thereon by plaintiffs would be too remote from commerce to be deemed a part of it, but the facts present a different question. As a mater of fact, even prior to the hearing of the case some of these vessels had been returned to commerce by sale to foreign interests, and furthermore, the only purpose for the stripping operations was to preserve the ships for future use in commerce, and the principles of stripping constituted maintenance within the principles announced in the above and other cases. Although the watchmen did not actually participate in the making of repairs or in the maintenance work as such, their services were so closely related to commerce as to be considered part of it. Bennett v. V. P. Loftis Co., 4 Cir., 167 F.2d 286; Slover v. Wathen, 4 Cir., 140 F.2d 258; Ritch v. Dredging Co., 9 Cir., 156 F.2d 334. In any event, the watching services in connection with preparing the outgoing ships for delivery to foreign interests were "in commerce" and, as stated, the court is of the opinion that the services in connection with the incoming ships were also "in commerce". And in addition, there is force in the plaintiffs' argument that the actual movement of the ships in commerce did not cease at the dock where the stripping was done, but at the final resting place of the ships in the lay-up basin.

█ The court also holds that plaintiffs were "engaged in production of goods for commerce" in view of (a) the shipment out of the State of items stripped from the ships, and (b) working on the ships both for delivery to foreign interests and contemplated subsequent use in commerce, as "ships" are included in the definition of "goods" in Sec. 3(a) of the Act.

■ The next question as stated above has to do with the relationship between the plaintiffs and the defendants. If the plaintiffs were employees of the United States Maritime Commission they were excluded from the benefits of the Act. The recent Supreme Court decision of Powell v. Cartridge Co. (and companion cases), 339 U. S. 497, 70 S.Ct. 755, 761, seems determinative of this question, and the court concludes on the facts found that the defendants and not the United States were the employers within the meaning of the Act, despite the control over the operations retained and exercised by the Government. This same high degree of control was exercised over the operations involved in the Powell case, but what the court said there applies here: "These incidents of the program did not, however, prevent the placing of managerial responsibility upon independent contractors." It is true that there are distinguishing differences between the two cases, but the court's view is that the holding in the Powell case requires the conclusion that the employer-employee relationship existed between the defendants and the plaintiffs and that the Act is applicable, entitling plaintiffs to a judgment in accord with Finding of Fact No. 3.

■ The defendants insist that the court in its discretion should award no liquidated damages, inasmuch as their action, as they contend, in withholding from plaintiffs the minimum wages provided for in the Act was taken in good faith, and they had reasonable grounds for believing that such action was not a violation of the Act, that is, for believing that plaintiffs were not covered by the Act's provisions, either because they were not engaged in commerce or in the production of goods for commerce, or because, if they were so engaged, they were employees of the United States and, therefore, expressly excluded from the Act. No difficulty is experienced in reaching the conclusion that the defendants acted in good faith, and it has appeared that plaintiffs make no serious contention to the contrary. But the plaintiffs strenuously assert that the evidence should not satisfy the court that the defendants had reasonable grounds for believing plaintiffs were not entitled to the benefits of the Act. Nevertheless, it does appear to the court's satisfaction that there was both "good faith" and "reasonable grounds", and the court has so found. Therefore, in the court's discretion, no liquidated damages will be allowed. It may be said, it seems, that the question of coverage is a close one, though, perhaps, this alone would be insufficient to support the finding of "reasonable grounds". It is certain that the benefits of the Act would be substantially curtailed by a policy of applying no penalty to those employers who decide all close questions in their own favor and defend by simply asserting that they acted honestly. It may be that the employer, in order to avoid the risk of the penalty of liquidated damages, must decide all close questions, where there has been no court decision or administrative order or ruling, in favor of the employee. It would seem, however, to be in accord with justice and equity that in reaching a decision of whether "reasonable grounds for believing" actually existed, the courts should avoid the application of a harsh criterion against one who, in any event, has acted honestly and in good faith. The court has found the following facts in connection with the defendants' good faith and reasonable grounds:

■ "The laying up program began near the end of 1946 and continued through 1947, tapering off until about the middle of 1948; only one of the plaintiffs was employed after May, 1948, the reason being the stripping operations had by that time virtually ceased; to that date the plaintiffs had raised no question over not receiving time and a half pay for hours worked over 40 hours in any one week, and had never complained to the defendants about it. The first knowledge of the complaint came to the defendants near the end of June, 1948, when a representative of the North Carolina Department of Labor conferred with the defendants, advising that several of the plaintiffs had written to the Department making

complaint about not having received overtime pay; in October, 1946, the Wilmington Shipping Company wrote to the North Carolina Commissioner of Labor, requesting permission to work employees more than 55 hours per week; this procedure had been in effect throughout the war when labor was scarce, and it was necessary to have specific authority from the State of North Carolina to work personnel more than 55 hours per week. (A copy of this letter has been filed for the record.) An investigator representing the North Carolina Department of Labor made an investigation and thereafter the Department, by letter dated December 26, 1946, copy of which has been filed for the record, stated that the defendant's business was exempted from the North Carolina Maximum Hour Law until further notice; the defendants, in good faith, considered this to mean that all watchmen were exempted from the Wage-Hour Law, and the action of the defendants in not paying overtime to the plaintiffs was based partly on this letter and their interpretation of it.

"The defendants, honestly and in good faith, believed that the plaintiffs were not engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act, because the ships came into Wilmington for one specific purpose, to be laid up for an undetermined and indefinite length of time, in fact to be withdrawn from commerce.

"The defendants, honestly and in good faith, regarded themselves as carrying out a Government operation not in any sense connected with commerce, that they were acting as Agents of the United States in accordance with specific and definite instructions as set forth in O.R. 125; and in good faith believed that they were not "employers" because of the provision in Title 29, Sec. 203(d), which excludes the United States from the definition of "employer".

These facts, in the court's view, constitute a fully adequate basis for the further finding that the defendants had reasonable grounds for the action taken.

## Findings of Facts

1. These two action were brought under the Fair Labor Standards Act of 1938, as amended, for the recovery of overtime pay, liquidated damages, and attorneys' fees. They were consolidated by consent for trial and were heard without a jury.

2. The defendants are North Carolina corporations, each with its principal office in Wilmington, North Carolina, and were engaged generally during the period mentioned in the complaints as shipping agents and in carrying on interstate commerce. The dealings between the plaintiffs and the defendant in the Heide case, and the underlying facts upon which the plaintiffs therein seek recovery and the defendant defends, are identical with the dealings between the plaintiffs and the defendant in the Wilmington Shipping Company case, as well as the facts upon which the plaintiffs therein seek to recover and the defendant defends, and for this reason the use of the word "defendants" hereinafter shall be taken to apply equally to both corporations.

3. It has been agreed between the plaintiffs and the defendants that the amount of overtime pay, if any, due to each plaintiff is as follows:

By Heide & Co., Inc.

| | |
|---|---|
| Burkhimer | $151.03 |
| Clemmons | 71.40 |
| Craig | 9.80 |
| Harvell | 84.70 |
| Hewitt | 85.93 |
| Holden | 40.60 |
| Miles, M. D. | 76.65 |
| Nylan | 245.00 |

By Wilmington Shipping Co.

| | |
|---|---|
| Burkhimer | $ 64.40 |
| Clemmons | 35.35 |
| Craig | 82.60 |
| Harvell | 70.53 |
| Holden | 94.68 |
| Landen | 78.40 |
| Miles, W. O. | 259.88 |
| Robinson | 29.40 |
| Royal | 103.75 |
| Shepard | 29.40 |
| Smith | 87.68 |
| Tartt | 2.80 |

4. The plaintiffs were employed by the defendants during the years 1946, 1947 and 1948, as watchmen on certain ships owned by the United States, represented by the War Shipping Administration (later the United States Maritime Commission), hereinafter referred to as "the Maritime Commission", and the watching services were performed on these ships while they were being prepared for lay-up in the Brunswick River (N. C.) reserve fleet lay-up basin or after they had been withdrawn from the lay-up basin to be transferred to foreign interests.

As compensation for their services the plaintiffs were uniformly paid 70 cents per hour for each hour worked, whether more or less than 40 hours per week, and each plaintiff during one or more weeks in these years worked more than 40 hours per week; the rate of hourly pay was fixed by the Maritime Commission.

5. During the last war and for a while thereafter, certain ships owned by the United States were operated either by various steamship operating companies for their own account, or by steamship companies under the direction of and for the account of the United States or by the British Government under the lend-lease agreement, and at various times after the end of the war upon request of these operating companies, or of the Maritime Commission, or of the British Government, many of these ships were redelivered to the Maritime Commission and upon such redelivery in each case the Maritime Commission proceeded to place the ship in one of the various lay-up basin reserve fleets on the Atlantic, Gulf and Pacific Coasts; these lay-up basins were constructed, maintained and used solely by the United States for the purpose of storing these surplus merchant ships so that it might have a reserve Maritime merchant fleet for use in any future emergency. There was, of course, no way of determining at the time these ships were being prepared for lay-up how long they would remain in the several lay-up basins.

After the Maritime Commission had decided in any case which basin to use for the particular ship, it arranged with one of its General Agents to take over and handle the lay-up operation. These General Agents of the Maritime Commission are steamship operating companies and they were appointed as such General Agents by "General Agency Agreements", hereinafter referred to as GAA. A specimen of this GAA and of amendments thereto have been filed for the record.

The important provisions of these agreements are found in Articles 1, 2, 6 and 7. Article 1 declares that the General Agent is an agent of the United States Government, and not an independent contractor, for the purpose of managing and conducting the business of ships assigned to it by the United States; Article 2 obligates the General Agent "to manage and conduct the business for the United States in accordance with such directions, orders, or regulations as the latter has prescribed, or from time to time may prescribe, and upon the terms and conditions herein provided, such vessels as have been or may be by the United States assigned to and accepted by the General Agent for that purpose". Article 6 provides, among other things, that: "The General Agent shall exercise due diligence in the selection of Agents. Such Agents shall be subject to disapproval by the United States and any agency agreement shall be terminated by the General Agent whenever the United States shall so direct. Any compensation payable by the General Agent to its Agents for services rendered in connection with the vessels assigned hereunder shall be subject to approval by the United States." Article 7 provides, among other things, that: "The United States shall reimburse the General Agent at stated intervals determined by the United States for all expenditures of every kind made by it in performing, procuring or supplying the services * * * required hereunder. * * * *"

In connection with the business of laying up the ships, the Maritime Commission published Operations Regulation 125 (hereafter referred to as O.R. 125) which was a directive prescribing in detail what should be done to each ship being pre-

pared for lay-up. A copy of O.R. 125 has been filed for the record.

The operation of preparing a ship for lay-up is known as "stripping" and consists of removing various items of equipment and of perishable and dry stores; it also includes considerable work in the engine room to prepare the engine and auxiliaries for an indefinite lay-up; the items stripped from the ship were delivered under order of the Maritime Commission to one of its warehouses, either at Wilmington, N. C., or at Norfolk, Virginia.

When the Maritime Commission accepted redelivery of the ship form one of its operators it notified one of its General Agents that the ship was to be delivered to such General Agent at a designated port under the GAA for stripping under O.R. 125 and laying up in a designated basin such as the Brunswick River Basin near Wilmington, N. C., in which all of the ships involved were laid up.

Previously, the South Atlantic Steamship Line, one of the General Agents of the Maritime Commission, had entered into agreements with the defendants to have charge of the stripping and laying up of such ships as might be assigned by the Maritime Commission to the lay-up basin in Brunswick River near Wilmington. This agreement between the South Atlantic Steamship Line, General Agent, and the defendants, was not reduced to writing, but it was entered into with the knowledge and approval of the Maritime Commission and under it the defendants were to be reimbursed for all expenditures incurred in carrying out the operations, and in addition were to receive in each case an agreed fixed fee.

Following notification, as above mentioned, that a particular ship was to be delivered to it, the General Agent arranged for its movement to Southport, N. C., at the mouth of the Cape Fear River, and thereupon notified either one or the other of the defendants that such ship was being sent to it for stripping and lay-up under GAA, in accordance with O.R. 125. A letter giving such notice in one instance (and it is agreed that such is typical of all transactions) was as follows:

"South Atlantic Steamship Line
Savannah, Georgia

October 13, 1947
File M-Oper (T)

Wilmington Shipping Company
P. O. Box 270
Wilmington, N. C.

Gentlemen:
S/S "Fort Gibralter"

The above vessel is to be delivered to us at Charleston under GAA for stripping and lay-up in the Wilmington Reserve Fleet. Vessel is to be stripped at Wilmington.

Our Agents, Charleston, The Carolina Shipping Company, will advise you date and time vessel leaves Charleston in tow for Wilmington.

Your attention, as our Agents to the stripping and redelivery of vessel to the U. S. Maritime Commission in accordance with Operations Regulations No. 125 will be appreciated.

Copy of inventory for all departments covering vessel at time of her delivery to us under GAA will be sent to you for use in stripping vessel for lay-up.

Very truly yours,
United States of America
United States Maritime Commission
By: South Atlantic Steamship Line,
Agents

By: E. H. Wilson,
Asst. Operating Mgr."

When a ship would come to Wilmington, or to Southport, under her own power, she had no cargo aboard and as soon as she was berthed at the wharf in Wilmington the crew was discharged, the steam shut down, and she became a dead hulk; if she came to Wilmington in tow she was already a dead hulk with no cargo aboard and only a master and skeleton riding crew, which was discharged when the ship was berthed at Wilmington.

On arrival of the ship at Southport on its way to Wilmington, that defendant with which arrangement had been made by the General Agent would employ a local tug to assist in towing the ship up the Cape

Fear River to one of the docks in Wilmington, where the stripping operation took place. Neither defendant owned any dockage facilities, and the ships were docked either at public terminals or at the shipyard docks, which are the property of the United States Government.

The stripping process for each ship required an average of about 7 days, and during that period of time the plaintiffs were employed as watchmen to protect the ships; a watch was maintained 24 hours per day.

6. Upon completion of the stripping operations the defendants notified the Maritime Commission, which thereupon had an inspection made to determine whether the stripping operations had been carried out properly; if so, the defendant involved arranged to have the ship towed to the reserve fleet basin in Brunswick River. Prior to this the Maritime Commission had approved charges to be made by local towing companies for the handling of these ships; that is, in the first instance, for picking up the ships at the mouth of the Cape Fear River and moving them to the Wilmington docks to be stripped, and later for transferring them from the docks where they were stripped to the reserve fleet basin. The manner in which the local towing company rendered its bill for services is typified by the bill rendered in the case of the S. S. Daniel Willard, which was as follows: "The United States of America, United States Maritime Commission, Vessel S. S. Daniel Willard, South Atlantic Steamship Company, General Agent, Wilmington Shipping Company, Sub-agent". However, neither of the two local towing companies, that is, Stone Towing Company and Cape Fear Towing Company, had any account on its books with the Maritime Commission or the ship operators, but all accounts were against the defendants individually and not as agents of the United States Maritime Commission, the South Atlantic Steamship Company, or of any other person or corporation. These local towing companies looked to the defendants for payment of their bills as they had no contract with and were never employed by the Maritime Commission. However, the Maritime Commission did send a representative to Wilmington to confer with the local towing companies on the cost of handling of the ships, and at the conference the towing companies and the Maritime Commission agreed upon a price per ship for towing. Thereafter, additional correspondence passed directly between the Maritime Commission and the towing companies on this subject of towing rates. All expenses of towing and of the stripping operations were paid by the defendants, and thereafter the defendants prepared an account covering such total expenditures for each ship and forwarded it to the General Agent; the General Agent then reimbursed the defendants and paid to each in every case an agreed fixed fee; in turn the General Agent was reimbursed by the United States Maritime Commission for all payments to the defendants and was also paid an agreed fixed fee by the United States Maritime Commission.

7. A number of the ships which, after being stripped, were laid up in the Brunswick River basin later on were transferred by the Maritime Commission for the United States to foreign interests; in these cases negotiations for the transfer of a ship from the United States to a foreign interest were conducted by these foreign interests or their General Agent in this country; usually the foreign interests employed a local agent at Wilmington to handle the details of the transfer and both defendants acted as such local agents. Following these negotiations the local agent (one of the defendants) was advised by the Maritime Commission District Manager, Norfolk, Virginia, or by the reserve fleet Superintendent, Wilmington, N. C., that the ship was ready for delivery to the prospective purchaser and thereupon one of the defendants arranged for towing service from the lay-up basin in the Brunswick River to a wharf at Wilmington, N. C.; while these ships were at the wharf at Wilmington, the defendants arranged for watching service, a standby crew until the regular crew arrived, provided supplies, and made all other necessary arrangements. Such ships were

transferred to the custody of the foreign interests at Wilmington, and thereafter the defendants submitted disbursement accounts to the foreign interests for settlement.

8. In the case of the incoming ships, the defendants had full control from the time that they were taken into custody from the General Agent at Southport, N. C. until later delivered to the lay-up basin in Brunswick River; they employed the tugs to tow the ships from Southport to the terminals at Wilmington, they moored the ships there while the stripping operations took place; they hired watchmen and all other employees who had anything to do with the ship while it was moored and being stripped, and later transferred to the lay-up basin. The defendants took into custody all the stores found upon the ships and crated and shipped them either to Norfolk, Virginia, where the Maritime Commission had a warehouse, or delivered them to the Maritime Commission's warehouse at Wilmington, N. C., all of which was done in accordance with the directions contained in O.R. 125. The defendants employed all tugs, all workmen, and engaged all necessary insurance.

9. The laying up program began near the end of 1946 and continued through 1947, tapering off until about the middle of 1948; only one of the plaintiffs was employed after May, 1948, the reason being the stripping operations had by that time virtually ceased; to that date the plaintiffs had raised no question over not receiving time and a half pay for hours worked over 40 hours in any one week, and had never complained to the defendants about it. The first knowledge of the complaint came to the defendants near the end of June, 1948, when a representative of the North Carolina Department of Labor conferred with the defendants, advising that several of the plaintiffs had written to the Department making complaint about not having received overtime pay; in October, 1946, the Wilmington Shipping Company wrote to the North Carolina Commission of Labor, requesting permission to work employees more than 55 hours per week; this procedure had been in effect throughout the war when labor was scarce, and it was necessary to have specific authority from the State of North Carolina to work personnel more than 55 hours per week. (A copy of this letter has been filed for the record.) An investigator representing the North Carolina Department of Labor made an investigation and thereafter the Department, by letter dated December 26, 1946, copy of which has been filed for the record, stated that the defendant's business was exempted from the North Carolina Maximum Hour Law until further notice; the defendants, in good faith, considered this to mean that all watchmen were exempted from the Wage-Hour Law, and the action of the defendants in not paying overtime to the plaintiffs was based partly on this letter and their interpretation of it.

The defendants, honestly and in good faith, believed that the plaintiffs were not engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act, because the ships came into Wilmington for one specific purpose, to be laid up for an undetermined and indefinite length of time, in fact to be withdrawn from commerce.

The defendants, honestly and in good faith, regarded themselves as carrying out a Government operation not in any sense connected with commerce, that they were acting as Agents of the United States in accordance with specific and definite instructions as set forth in O.R. 125; and in good faith believed that they were not "employers" because of the provision in Title 29, Sec. 203(d), which excludes the United States from the definition of "employer".

10. The omission of the defendants to pay the plaintiffs overtime wages was in good faith, and each defendant had reasonable grounds for believing that such omission was not a violation of the Fair Labor Standards Act of 1938, as amended. 29 U.S.C.A. § 260.

## Conclusions of Law

Upon the foregoing facts, the Court has reached the following legal conclusions:

1. The plaintiffs, in their performance of services as watchmen upon the ships handled by the defendants, were engaged in commerce and in the production of goods for commerce within the purview of the Fair Labor Standards Act, as amended.

2. The defendants were independent contractors and did not act as agents of the United States Maritime Commission.

3. Plaintiffs were employees of the defendants and were not employees of the United States Maritime Commission.

4. Plaintiffs' services as watchmen were covered by the Fair Labor Standards Act, and they are therefore entitled to recover overtime pay as set out in Finding of Fact No. 3.

5. Plaintiffs are not awarded any amount of liquidated damages, as the Court· in its discretion has decided against such allowance, in view of the finding that the omission of the defendants to pay such overtime wages was in good faith and that the defendants had reasonable grounds for believing such omission was not a violation of the Fair Labor Standards Act, as amended.

6. Plaintiffs are entitled to allowance of reasonable attorneys' fees. The Court finds that a reasonable attorneys' fee to be paid by the Wilmington Shipping Company is $316.00, and a reasonable attorneys' fee to be paid by Heide & Company, Inc. is $255.00.

7. Plaintiffs are entitled to costs.