In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3933

GABRIELLE M., a minor, by and through her parents
and next friend, STANLEY and THERESA M.,

*Plaintiff-Appellant*,

*v.*

PARK FOREST-CHICAGO HEIGHTS, ILLINOIS
SCHOOL DISTRICT 163 and GEORGE MCJIMPSEY,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 7075—**Joan Humphrey Lefkow**, Judge.

ARGUED JULY 10, 2002—DECIDED JANUARY 14, 2003

Before COFFEY, KANNE, and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. Five-year-old Gabrielle M. began
kindergarten at Beacon Hill School in the Park Forest-
Chicago Heights School District on August 31, 1998.
Gabrielle was one of roughly 20 students in Mary Mulry's
class, which was also supervised by teacher's aide Eliza-
beth Roselli. Mulry's classroom was one of seven kindergar-
ten classes at the school that year.

Gabrielle stated in her deposition that Jason L., another
five year old in her class, began "bothering" her on the first

day of class (Gabrielle did not explain what she meant by "bothering"). Gabrielle did not tell school officials or her parents about Jason's behavior. Although Gabrielle had been eager to start school, her parents noticed in September that she became reluctant to go to school, crying at the door when it was time to go. She also began wetting her bed and having nightmares around this time. At the time, Gabrielle's parents did not know what caused the changes in her behavior.

In October, Mulry began to notice Jason's problematic behavior. Early in the month, Mulry saw Jason jump on Gabrielle's back at recess. She separated the two, and Jason was suspended from recess for the rest of the week. On October 21, Roselli saw Jason lean against Gabrielle with his hands on his crotch. Roselli removed Jason from the room and took him to the principal's office. The principal, George McJimpsey, was not in his office, so Roselli put Jason in time out, away from other students, and described Jason's behavior to Mulry. Later that day, a student told Mulry that Jason had unzipped his pants and was showing other students his underwear while her back was turned. Roselli again took Jason to McJimpsey's office and informed him of both incidents that occurred that day. McJimpsey told Jason that his behavior was inappropriate and warned him not to repeat it. Roselli and Jason then returned to class and Roselli seated Jason separately from the other students. After school, Mulry called Jason's mother and told her to call McJimpsey about the incidents.

Two days later, Jason again unzipped his pants in class. Mulry separated Jason from the rest of the class, but Jason left his seat and again unzipped his pants in front of other boys. Mulry took Jason to McJimpsey's office, and McJimpsey phoned Jason's mother. Jason received a half hour of after-school detention because of the incident.

On October 28, Mulry noticed that Jason and a classmate, Ashley, had their hands down each others' pants during storytime. Mulry immediately told the two to come over to her and Ashley reported that another girl, Tatiana, was also putting her hands down other students' pants. Mulry asked a teacher's aide to take Jason, Ashley, and Tatiana to the school psychologist, Larry Anthony. Anthony sent for Gabrielle and another girl when the children in his office told him that the two girls were also involved. During Anthony's meeting with the five children, the children informed him that during the previous week they had kissed and jumped on top of one another at recess. Anthony told them that their behavior was inappropriate and that they should tell their parents or teachers when such things occurred. After school, Mulry went to Anthony's office, and Anthony described the meeting to her and called the children's parents. In his notes regarding the incident, Anthony reported that it was "becoming apparent that these Kindergarteners [sic] were not fully aware of the seriousness of their actions."

Theresa, Gabrielle's mother, went to the school the next day to talk with McJimpsey. Theresa then took Gabrielle to lunch to speak with her privately, at which time Gabrielle told her she didn't want to go back to school because Jason had been doing "nasty stuff" to her since her first day.

After returning Gabrielle to school, Theresa told Mulry about her conversation with Gabrielle and that Gabrielle had recently developed problems with nightmares and bedwetting. That day Theresa also asked McJimpsey to move Gabrielle to a different classroom. McJimpsey agreed and also suspended Jason from school for two days. Theresa called McJimpsey the next day to ask that Jason switch classrooms instead of Gabrielle. According to Theresa, McJimpsey initially resisted, but transferred Jason after Theresa threatened to remove Gabrielle from

the school. McJimpsey also agreed to assign Jason to different lunch and recess times.

Lunchroom supervisors separated Jason from the other students in the lunchroom for two weeks. After that, Jason returned from isolation and rejoined the other students for lunch. When he returned, Jason's and Gabrielle's classes were still assigned to the same lunch and recess period. Nevertheless, they did not eat together: Jason's class would eat lunch at one table, while Gabrielle's would eat at another. And at recess, a playground supervisor was to ensure that Jason's class did not interact with Gabrielle's class. For example, one group would be allowed to play on the swing and exercise equipment while the other group played on the blacktop. Despite this effort, Gabrielle told her mother that once Jason returned to the same lunch and recess period, he talked to her and said that he "want[ed] to play with me funny ways" at recess. Gabrielle stated in her deposition that she also told her teacher and principal that Jason continued to bother her. Theresa stated that she also complained to McJimpsey. According to McJimpsey, he promptly rescheduled lunch for Mulry's students so that Jason and Gabrielle would not go to lunch or recess at the same time. But according to a letter from Gabrielle's attorney to the school district, Jason continued to bother Gabrielle at lunch and recess until March 1 despite these actions.[1]

---

[1] The record reveals that Gabrielle does not dispute that McJimpsey initially assigned an instructor to ensure that Jason's and Gabrielle's classes did not interact at lunch or recess or that he eventually assigned her class and Jason's to different lunch and recess periods altogether. In response to the defendants' uncontested statement of facts in which they cite Mulry's and McJimpsey's testimony on these points, Gabrielle questions only the effectiveness of the supervision and later separation assert-

(continued...)

In early November, Gabrielle's parents took her to her pediatrician because she was experiencing bedwetting, insomnia, nightmares, and loss of appetite. The doctor referred her to a counselor, who diagnosed Gabrielle with acute stress disorder and separation anxiety due to Jason's behavior toward her. Gabrielle continued therapy until May 1999, when her counselor determined that she was asymptomatic.

---

[1] (...continued)
ing that (1) "following this change," there were approximately thirty days of inclement weather during which time the two classes would have lunch and recess in the same lunchroom at the same time and that (2) Gabrielle reported as late as March 1999 that she was still being bothered by Jason at lunch and recess. (R. 27 at ¶¶ 113, 115.)

The only part of the record that denies that the school took these actions is the March 1 letter from Gabrielle's counsel. The unsupported allegations of counsel cannot provide evidence sufficient to withstand summary judgment. *See*, *e.g.*, *Thorn v. IBM, Inc.*, 101 F.3d 70, 75 (8th Cir. 1996). Thus, to the extent this letter differs from Gabrielle's admissions of fact in response to defendants' uncontested statement of facts, it is immaterial. Moreover, the statement of counsel therein that "it has come to the attention of the parents that the boy is assigned to the same 'black top' period as Gabrielle" is itself inadmissible hearsay, which cannot be introduced to prove the truth of the matter asserted.

Finally, Gabrielle's own deposition testimony is consistent with the denials and admissions set forth in her response to the defendants' uncontested statement of facts: that sometime after Jason had been switched to another class, he continued to bother her at lunch and recess. Based on her admissions, that testimony can refer only to the period of time that both students were assigned to the same lunch and recess period under supervision, or those approximately thirty days of inclement weather where they would have been in the same lunchroom for both periods.

Sometime in the spring of 1999, Gabrielle's parents asked the school district to transfer her to another school. The school district agreed, and Gabrielle began first grade at Algonquin School. It is not clear when her parents made the request, though McJimpsey stated in his deposition that the Superintendent of Schools granted the request "immediately."

Gabrielle sued McJimpsey for intentional infliction of emotional distress and her school district under Title IX of the Education Amendments of 1972 alleging that Jason's conduct amounted to sexual harassment. Generally, Gabrielle claims that Jason "bother[ed]" her and did "nasty stuff" to her since the beginning of the school year. Moreover, Gabrielle's father, Stanley, testified that Gabrielle had told him that Jason had touched her inappropriately:

> Q: Did Gabrielle ever tell you that she had been touched by [Jason]?
>
> A: Yes.
>
> Q: Sexually?
>
> A: Yeah, he fondled pretty much half the girls in the classroom.
>
> Q: Where was it that he was fondling them? Did she tell you?
>
> A: Private parts, chest.

(R. 24, Stanley Dep. at 24:5-13.) Specifically, Gabrielle identifies the events occurring during the week of October 21 (i.e., Jason jumping on her back; Jason pulling down his pants in front of the class; his leaning against Gabrielle in the computer room; and the five students climbing upon and kissing one another) and October 28 (i.e., the storytime incident between Jason, Gabrielle, and other girls in the class) as evidence of Jason's harassing conduct. Gabrielle also claims that after the school district had

learned of Jason's conduct and had taken action to separate him from Gabrielle on her mother's request, the two continued to have contact for as long as four months during lunch and recess, where Jason continued "trying to get [her] attention when [she] was trying to eat at lunch time, and kept on wanting to play with [her] funny ways at recess time."

The school district moved for summary judgment arguing that the complained-of conduct did not rise to an actionable level for purposes of Title IX and that, even if it did, the school's response to Jason's conduct was not clearly unreasonable. In awarding summary judgment, the district court found that the school district had actual notice of Jason's behavior as of October 21, when Roselli saw Jason act inappropriately toward Gabrielle. The court then evaluated the district's response to Jason's behavior and found the response to be adequate. The court found that summary judgment therefore was appropriate on Gabrielle's federal claim and accordingly declined to exercise supplemental jurisdiction over the state-law tort claim against McJimpsey.

## DISCUSSION

On appeal, Gabrielle argues that the district court improperly granted summary judgment on her Title IX sexual harassment claim. The Supreme Court has held that a school district receiving federal funding may be liable for damages under Title IX when one student sexually harasses another. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999). The court established in *Davis* that liability may exist "where [funding recipients] are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

Before we evaluate whether the school district's actions (or refusals to act) amounted to deliberate indifference, *Davis* requires us to examine the student-on-student harassing conduct itself to determine whether it is "so severe, pervasive, and objectively offensive" that it has a "concrete, negative effect" on the victim's access to education. *Id.* There is a threshold question, altogether reasonable and rational, of whether a five or six year old kindergartner can ever engage in conduct constituting "sexual harassment" or "gender discrimination" under Title IX. Common sense, at least, would reject any such extension of Title IX. Nevertheless, we need not answer whether six year old Jason should carry the label of "sexual harasser," as we will assume *arguendo* that Jason's conduct was "sexual harassment."

Even assuming that Jason's conduct amounts to "sexual harassment," thus bringing it within the ambit of Title IX, an action under this statute "will lie only for [sexual] harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to educational opportunity or benefit." *Id.* at 633. Whether behavior is so severe, pervasive, and offensive as to create a cause of action under Title IX is a fact-specific inquiry. The Court in *Davis* recognized the obvious fact that young children are still in the process of learning appropriate behavior and "may regularly interact in a manner that would be unacceptable among adults." *Id.* at 651. Acknowledging that almost by definition young children engage in this "dizzying array of immature . . . behavior," the *Davis* Court distinguished "simple acts of teasing and name calling among children" from behavior that could constitute actionable harassment. *Id.* at 651-52 (quotation omitted).

Most of the complained-of conduct alleged by Gabrielle is so vague and unspecific that it cannot provide a basis to determine whether that conduct was severe, pervasive,

and objectively offensive harassment. It is well established that in order to withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations. Fed. R. Civ. P. 56(e); *Hadley v. County of DuPage*, 715 F.2d 1238, 1243 (7th Cir. 1983) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). Thus, Gabrielle cannot avoid summary judgment by asserting general allegations that Jason "bothered" her by doing "nasty stuff." In the context of peer harassment between five and six year olds, such allegations are as indicative of nonactionable teasing and name calling as they are of potentially actionable harassment, and thus they provide no support for Gabrielle's claim. Nor can she avoid summary judgment by her equally unspecific testimony that Jason wanted to play with her "funny ways" at recess. Similar allegations of unarticulated conduct have been shown to be insufficient to defeat summary judgment in hostile-work-environment cases. *See, e.g.*, *Bloomer v. Slater*, 2002 WL 1949728, at *9 (N.D. Ill. Aug. 23, 2002) (refusing to allow plaintiff to rely on vague, general allegations of inappropriate comments to support hostile environment claim where plaintiff presented no evidence of the details of the offending conduct). Moreover, her father's testimony that Gabrielle had told him that Jason touched her inappropriately is also insufficient evidence to support her claim. First, it is hearsay and cannot be admitted to prove the truth of the matter asserted—that Jason touched Gabrielle. Second, even if it was admissible it is still too vague and general: although it is more specific than Gabrielle's other allegations because it identifies the areas Jason allegedly touched—"[p]rivate parts, chest"—it still does not present details of when, where, or how often this alleged conduct occurred and whether it was reported. Those details

are necessary to evaluate the severity and pervasiveness of the conduct, *see, e.g.*, *Manfredi v. Mount Vernon Bd. of Educ.*, 94 F. Supp. 447, 454-55 (S.D.N.Y. 2000) (finding a single incident of offensive touching between first graders insufficient to rise to the level of severe, pervasive, and objectively offensive conduct given the *Davis* Court's cautionary statement that it was "unlikely Congress would have thought such behavior sufficient . . . in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." (citing *Davis*, 526 U.S. at 652-53)), not to mention other requisite elements of a Title IX deliberate-indifference claim, such as actual knowledge.

We turn, therefore, to the specific instances of inappropriate conduct alleged by Gabrielle and reported to school officials, which include Jason's jumping on Gabrielle's and other students' backs and kissing each other, Jason pulling his pants down in front of other students, the computer-room incident, and the story-time incident. Leaving aside for a moment the fact that not all of these incidents involve conduct between Jason and Gabrielle (or Jason and other girls for that matter), the only evidence in the record shows that Jason and the other children involved were unaware of the sexual nature of their behavior. According to the school psychologist, Anthony, the children were "unaware of the seriousness" of their actions. The children, then, were not engaging in knowingly sexual acts, a fact that (at a minimum) detracts from the severity and offensiveness of their actions.

Moreover, an action under Title IX lies only where the behavior at issue denies a victim equal access to education. *Id.* at 652. The harassment must have a "concrete, negative effect" on the victim's education. *Id.* at 654. Examples of a negative impact on access to education may include dropping grades, *id.* at 634, becoming homebound or

hospitalized due to harassment, *see Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248-49 (10th Cir. 1999), or physical violence, *see Vance v. Spencer County Public Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000). Here, however, there is no evidence that Gabrielle was denied access to an education. Although she was diagnosed with some psychological problems, the record shows that her grades remained steady and her absenteeism from school did not increase. Nothing in the record shows that she was denied any educational opportunities by Jason's actions.

But even if we were to decide Jason's actions were severe, pervasive, and objectively offensive sexual harassment that had a concrete, negative effect on Gabrielle's access to education, we are not convinced that the school district's response to known harassment was clearly unreasonable. Examining the school district's response to the complained-of conduct, we agree with the district court's conclusion that the school district's actions were not so clearly unreasonable as to amount to deliberate indifference.

As an initial matter, the school district can only be liable for harassment about which it has actual knowledge. Gabrielle argues that the school district had actual notice of Jason's behavior as of August 31 (the first day of school), because Gabrielle testified that Jason began bothering her on the first day and because the teachers constantly supervise kindergartners and thus must have noticed this behavior. While it is certainly true that such young students are under near-constant supervision, *Davis* established that actual—not constructive—notice is the appropriate standard in peer-harassment cases. *Davis*, 526 U.S. at 646-47. Courts, therefore, have focused on reports or observations in the record of inappropriate behavior to determine when school officials had actual notice. *See Vance*, 231 F.3d at 259 (notice requirement satisfied

by student and parent's reports to teachers and principal); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (defendants had actual notice of rape and sexual assault only after incidents were reported to them); *Murrell*, 186 F.3d at 1247 (parent's telephone call to principal about harassment was evidence of actual notice). Nothing in the record shows that Beacon Hill school officials observed or that anyone reported sexual behavior by Jason towards Gabrielle (or anyone else) before October 21. Thus, there is no evidence that the defendants had notice of any harassing conduct before this date.

Once school officials have actual notice of sexual harassment, *Davis* imposes a duty to act. But as long as the school's response is not "clearly unreasonable," it cannot have acted with the requisite deliberate indifference to incur Title IX liability. *Davis*, 526 U.S. at 648-49. According to *Davis*, this is not a mere reasonableness standard, nor does it require funding recipients to remedy peer harassment. *Id.* Indeed, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

This is such an appropriate case. The record reveals that the school district's response to Jason's inappropriate conduct was not clearly unreasonable. After each reported or observed instance involving Jason and other students, Jason was disciplined and steps were taken to prevent future inappropriate conduct. When Mulry saw Jason jump on Gabrielle's back at recess, he was disciplined and suspended from recess for the rest of the week. When Jason leaned against Gabrielle with his hands on his zipper, he was placed in time out. When he pulled down his pants exposing his underwear to other students in the class, Jason was temporarily removed from the class, disciplined by McJimpsey, and his mother was called. When Jason

exposed himself to three other boys two days later, he was again sent to McJimpsey's office, his mother was called, and he received detention. And when Jason and Ashley were seen with their hands down each other's pants and when the students revealed that Gabrielle and others were involved as well, all of the students were sent to the school's psychologist to discuss the incident and their parents were called. After serving a two-day suspension, Jason was transferred to a different kindergarten class. Additionally, Jason was placed at an isolation table for two weeks during lunch and recess period before he was allowed to rejoin his new class.

Nevertheless, Gabrielle asserts that these actions were insufficient to protect her from further unwanted contact with Jason during lunch and recess. Notably, Gabrielle does not deny that McJimpsey took steps to minimize Jason's contact with Gabrielle during a communal lunch and recess period: each of the students' classes were assigned to different lunch tables and a recess supervisor was instructed to ensure that the two students did not interact at recess. Nor does she deny that McJimpsey eventually rescheduled the two classes to different lunch and recess periods. All that Gabrielle denies is the *remedial effect* of these steps, claiming that as late as March 1999, Jason continued to bother her. Presumably, McJimpsey's initial action of recess supervision was ineffective since Theresa subsequently complained that the two students continued to come into contact. Even after the lunch-and-recess-period switch, Gabrielle explains that Jason and Gabrielle would still have had occasion to interact during approximately thirty days of inclement weather where both classes would have had lunch and recess indoors at the same time in the same room.

But in arguing that in order not to act with deliberate indifference, the school district must have effectively ended all interaction between the two students to prevent con-

clusively any further harassment, Gabrielle misunderstands the law. *Davis* does not require funding recipients to remedy peer harassment. *Id.* at 648-49. *Davis* disapproved of a standard that would force funding recipients to suspend or expel every student accused of misconduct. *Id.* All that *Davis* requires is that the school not act *clearly unreasonably* in response to known instances of harassment. *Id.* Here, in light of each of the immediate disciplinary and preventative steps the school district had already taken in response to Jason's conduct, including most prominently the decisions to move him to another class entirely and eventually to grant Gabrielle's request for a school transfer, it was not clearly unreasonable as a matter of law initially to assign an instructor to oversee a communal recess and lunch period instead of immediately rescheduling the lunch and recess period for a whole kindergarten class. Nor is it clearly unreasonable that in days of inclement weather Gabrielle and Jason may have had occasion to interact in the one lunchroom where all the school's students had to take lunch. In both instances, the school may take into consideration administrative burdens or the disruption of other students' or their teachers' schedules in determining an appropriate response. As *Davis* noted, courts should refrain second-guessing the disciplinary decisions made by school administrators. *Id.* at 649; *cf. Ulichny v. Merton Community School District*, 249 F.3d 686, 706 (7th Cir. 2001) (opining that school administrators should be supported, rather than second-guessed, in their "heroic efforts" to teach our nation's young people).

Therefore, under existing law, taking into account the ages of the children involved, their apparent lack of knowledge of the nature of their actions, and the lack of impact on Gabrielle's ability to attend and perform at school, we find that the alleged harassment was not so severe, pervasive, and objectively offensive that it denied Gabrielle ac-

cess to educational opportunities. Even if it was, the school district's response was not so clearly unreasonable as to render it liable under Title IX. The judgment of the district court therefore is AFFIRMED.

ROVNER, *Circuit Judge*, concurring in part and concurring in the judgment. I concur with my brothers insofar as they conclude that the evidence does not permit the inference that the school district was deliberately indifferent to the harassment that Gabrielle M. was experiencing. *Ante* at 11-14. Once apprised of the harassment, the school district took a series of steps to separate Jason L. from Gabrielle—suspending him, then reassigning him to a different classroom, and ultimately reassigning his class to different lunch and recess periods—so that the harassment would not recur. Although there are hints in the record that Jason may have continued harassing Gabrielle even after the district took these steps—including in particular the letter from Gabrielle's attorney to the school district—there is no admissible evidence that I have found which provides concrete support for this point. Even if we indulge the inference that Jason may had the opportunity to harass Gabrielle on occasions when inclement weather resulted in shared lunch and recess periods (*see ante* at 4 n.1, 13-14), I agree that the evidence nonetheless fails to suggest that the school district was indifferent to this possibility.

However, in the course of affirming Judge Lefkow's decision to enter summary judgment in favor of the school district, the majority makes two additional points that are noteworthy: first, that because Jason, Gabrielle, and the

other children did not appreciate the gravity of the conduct at issue in this case, they "were not engaging in knowingly sexual acts, a fact that (at a minimum) detracts from the severity and offensiveness of their actions" (*ante* at 10); and second, that because the alleged harassment did not cause Gabrielle's grades to suffer or her absenteeism from school to increase, she was not deprived of the educational opportunities that Title IX protects (*id.* at 10-11).[1] I write separately to comment on these aspects of my colleagues' reasoning.

Although my colleagues have assumed for the sake of argument that the acts of a kindergarten student can amount to sexual harassment for purposes of Title IX (*see ante* at 8), they have done so with evident reluctance. They observe at the outset that "[t]here is a threshold question, altogether reasonable and rational, of whether a five or six year old kindergartner can ever engage in conduct constituting 'sexual harassment' or 'gender discrimination' under Title IX." *Id.* Our task, however, is not to "answer whether six year old Jason should carry the label of 'sexual harasser.'" *Id.* It is the school district, not Jason, that is charged with liability. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640-41, 119 S. Ct. 1661, 1670 (1999). The question we must decide is whether the school, when confronted with acts that amounted to sex-based harassment, evinced deliberate indifference to that harassment. *Id.* at 642-43, 644-45, 119 S. Ct. 1671, 1672. Having answered that question in the negative, we need go no fur-

---

[1] My colleagues also conclude that most of Gabrielle's allegations as to the nature of the harassment lack sufficient clarity and specificity to permit the court to determine whether the harassment was severe, pervasive, and objectively offensive. *Ante* at 8-9. This was not an argument that the school district made below or that the district court considered, nor is it an argument that the district makes on appeal.

ther; absent evidence of deliberate indifference to the harassment that Gabrielle has alleged, the district cannot be held liable for that alleged harassment.

My colleagues also suggest, however, that the validity of a Title IX claim for sexual harassment depends, at least to some degree, upon the sexual awareness of the harasser and harassee. When school psychologist Larry Anthony spoke with Jason, Gabrielle, and the other students who were kissing one another, jumping on top of one another, and putting their hands down one another's pants, it was his observation that the children were not fully aware of how serious their actions were. *Ante* at 3. This suggests to my colleagues that neither Jason nor the other children—including Gabrielle—were engaged in "knowingly" sexual acts. *Ante* at 10. Although my colleagues stop short of saying that sexual awareness is a prerequisite to a sexual harassment claim, they suggest that the absence of such awareness at the least renders the harassment less severe and less offensive than it otherwise might be. *Id.*

Although I too think it unlikely that either Jason or Gabrielle fully appreciated the sexual nature of his conduct, that factor by itself does not foreclose nor does it undermine Gabrielle's Title IX claim. Harassing conduct need not be motivated by sexual desire, nor must it be overtly sexual in nature, in order to support a claim of sex discrimination. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002 (1998); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001); *see also* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, at 3 & nn. 17, 19 (collecting cases) <http://www.ed.gov/offices/OCR/shguide/index.html#Guidance>. The pertinent question, for purposes of Title IX, is whether

the harasser engaged in conduct "on the basis of sex" that had the effect of denying the plaintiff access to educational opportunities. 20 U.S.C. § 1681(a); *see Oncale*, 523 U.S. at 80, 81, 118 S. Ct. at 1002. Here, the record readily supports the inference that Jason's acts were based on sex: although some of Jason's conduct involved boys as well as girls (showing his classmates his underwear, for example), the more intrusive and troubling aspects of his alleged behavior—including in particular touching Gabrielle's genitals—involved only Gabrielle and perhaps other girls in the class. And although Gabrielle, like Jason, may not have understood the sexual significance of Jason's actions, the evidence nonetheless suggests that she found them to be unwelcome and inappropriate. When first questioned about Jason's conduct by her mother, Gabrielle said that Jason had been touching her chest and genitals and had done other "nasty stuff" to her since the first day of school. She would later testify that when Jason rejoined his classmates for lunch and recess following a period of separation, he continued to approach Gabrielle and seek to "play with [her] funny ways" at recess. At the same time, one may readily infer from the evidence that Jason's conduct disturbed Gabrielle: she allegedly lost her enthusiasm for school, had nightmares and difficulty sleeping, wet her bed, and lost her appetite.

Moreover, whatever the children's comprehension may have been, the adults charged with their care and education had the ability to appreciate the inappropriate and potentially harmful nature of the conduct. In fact, school officials, once alerted to Jason's behavior, immediately recognized its problematic character. It is that recognition, rather than Jason's knowledge, that exposes the school district to liability. If the school knew that Jason was harassing one of his peers but remained idle in deliberate indifference to that harassment—in this way "causing" the harassment to continue and to deprive Gabrielle of ac-

cess to educational opportunities or benefits—it would face liability under Title IX. *See Davis*, 526 U.S. at 640-41, 644-45, 119 S. Ct. at 1670, 1672.

The knowledge and intent of the school district are therefore central to the liability determination; the knowledge and intent of the student perpetrating the harassment are really irrelevant. This is a point that has already been made in the employment context. Courts have repeatedly rejected the notion that a harasser's innocent intent will defeat liability under Title VII, reasoning that because it is the employer that is held liable for workplace harassment, it is the employer's response to the harassment, and not the perpetrator's intent, that matters. *See Newton v. Dep't of Air Force*, 85 F.3d 595, 599 (Fed. Cir. 1996); *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991); *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 925 n.3 (5th Cir. 1982); *Bundy v. Jackson*, 641 F.2d 934, 945 (D.C. Cir. 1981); *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (opinion of Goldberg, J.), *cert. denied*, 406 U.S. 957, 92 S. Ct. 2058 (1972); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, 106 S. Ct. 2399, 2404-05, 2405-06 (1986) (describing elements of hostile environment claim without reference to harasser's intent). The same principle ought to hold true in the school environment. Jason likely did not realize that he was harming his female classmate; but his ignorance says nothing about the extent to which his actions interfered with Gabrielle's educational opportunities or about the school district's awareness of and response to his conduct. Conversely, Jason's knowledge and intent, even if culpable, would not suffice to render the school district liable—only the district's own deliberate indifference to the harassment could do that. *Davis*, 526 U.S. at 640-41, 644-45, 119 S. Ct. at 1670, 1672. Our focus, in sum, properly rests on what the school district knew and intended, not on what Jason was capable of realizing at age six.

I also part ways with my colleagues as to whether the alleged harassment had a sufficiently "concrete, negative effect" to be cognizable under Title IX. *See ante* at 10, quoting *Davis*. Because Gabrielle's grades did not fall as a result of the harassment and because she was able to continue attending school, my colleagues conclude that there is no proof that she was denied any educational opportunities by Jason's actions. *Id.* I respectfully suggest that their view of the way in which harassment can interfere with a student's educational opportunities is too narrow. *Davis* holds that "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied access to an institution's resources and opportunities." 526 U.S. at 651, 119 S. Ct. at 1675. Construing the record favorably to Gabrielle, one may readily infer that the alleged harassment traumatized her psychologically: she lost her excitement for school, she resisted going to school, she was emotionally distraught, she had nightmares and difficulty sleeping, she lost her appetite, and she began wetting her bed. It is easy to imagine how such trauma might have interfered with her access to educational opportunities. *See generally* Michele Goodwin, *Sex, Theory & Practice: Reconciling* Davis v. Monroe *& The Harms Caused by Children*, 51 DEPAUL L. REV. 805, 818-22 (2002); Diane M. Welsh, *Limiting Liability Through Education: Do School Districts Have a Responsibility to Teach Students About Peer Sexual Harassment?*, 6 AM. U. J. GENDER & L. 165, 171-75 (1997).

The fact that Gabrielle's grades did not suffer is by no means dispositive. Certainly at the kindergarten level, where learning social skills is at least as important as academic instruction, grades do not tell the complete story of how well a student is doing. At the same time, in Title VII cases, we have repeatedly rejected the notion that

a victim's ability to keep doing her job in the face of harassment will defeat her contention that the workplace was hostile. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir. 1994); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1454-55 (7th Cir. 1994); *Saxton v. AT&T Co.*, 10 F.3d 526, 534-35 n.14 (7th Cir. 1993). As Justice Scalia has observed, "[T]he test is not whether work has been impaired, but whether working conditions have been discriminatorily altered." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 114 S. Ct. 367, 372 (1993) (Scalia, J., concurring); *see also ibid.* (Ginsburg, J., concurring). I see no reason to follow a different rule for purposes of Title IX. If anything, courts ought to be more flexible in assessing the harms that a child experiences as a result of harassment, given that children (especially young children) are far less able to articulate the fact and extent of their injuries and may manifest an array of different reactions to the harassment. Gabrielle may have managed to keep her grades up, yet she nonetheless may have confronted a hostile environment that made it much more difficult for her to develop and achieve as a student.

Also in the employment context, the Supreme Court has firmly rejected any requirement that the victim of harassment suffer the equivalent of a nervous breakdown before she can recover under a hostile environment theory. *Harris*, 510 U.S. at 22, 114 S. Ct. at 370-71. "A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers," the Court explained. *Id.* at 22, 114 S. Ct. at 371. Likewise, a hostile school environment should be actionable before it results in consequences so dramatic as hospitalization or leaving school. *See ante* at 10-11.

The record here readily supports the inference that Gabrielle suffered a psychological injury as a result of the harassment, an injury that not only made her reluctant to attend school but ultimately required months of psychotherapy to address. This is more than enough evidence of a "concrete, negative effect" on Gabrielle's education to establish a question of fact as to the harm that Gabrielle suffered as a result of the alleged harassment. Neither she nor future victims of schoolplace harassment should be penalized simply because they seem resilient. In fact, there is no telling at this time what damage Gabrielle's traumatic experiences might cause her in the years to come.

For these reasons, I join my colleagues only insofar as they conclude that there is insufficient proof of the school district's deliberate indifference to the alleged harassment to proceed beyond summary judgment.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*